TLT CONSTRUCTION CORP., Plaintiff,

v.

The UNITED STATES, Defendant,

v.

McCarty Corporation, Inc., Intervenor.

No. 01–92C.

United States Court of Federal Claims.

Aug. 28, 2001.[1]

1. This opinion was issued under seal on April 24, 2001. The opinion gave the parties the opportunity to identify any protected or privileged material subject to deletion. The opinion is now published in its original form as none of the parties proposed any redactions.

Robert Symon, Spriggs & Hollingsworth, Washington, D.C., for Plaintiff.

Elizabeth Candler, U.S. Department of Justice, Washington, D.C., with whom were James M. Kinsella, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Stuart E. Schiffer, Acting Assistant Attorney General, for Defendant.

Scott Schoenfeld, Jenkins & Gilchrist, Washington, D.C., for Intervenor.

## OPINION

SMITH, Senior Judge.

The congressional purpose behind the bid protest jurisdiction of this court is two-fold. It is to protect the contractor from being arbitrarily treated, and thus encourage potential contractors to deal with the government. Its other purpose is to prevent government officials from exercising their contracting decisions in ways that reduce the government's ability to get the best deal in their procurement. In this category the abuses of favoritism, bias, and personal benefit, are the concern of the statute. It is not the purpose of the law to judicialize the procurement decision, though to some extent this is the inevitable result of any judicial review. Which deal is best for the government is a decision that only an officer of the executive branch, in this case a contracting officer, can make. Courts should not overturn any award decision unless that award decision violates law or reason. In this case neither has been violated, and therefore the court must abstain from awarding injunctive relief on this record.

This bid protest action is before the court on Cross–Motions for Judgment on the Administrative Record. Plaintiff requests injunctive relief and declaratory judgment, averring that prejudicial errors occurred during the selection process. Defendant claims that the contracting officer acted within the discretion given to her under the applicable statutes and that her conduct does not constitute an arbitrary or capricious act, or is otherwise in violation of the law. After considering the matter based on oral argument, the pleadings, the Administrative Record, and depositions, the court DENIES the plaintiff's Motion for Judgment on the Administrative Record. The court GRANTS the defendant's Cross–Motion for Judgment on the Administrative Record.

## STANDARD OF REVIEW

This court was given authority to hear bid protest cases in 1996. *See* 28 U.S.C. § 1491(b), as amended by Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, Stat. 3870, 3874–74 (1996). The bid protest statute requires the court to apply the Administrative Procedure Act's standard of review. *See* 5 U.S.C. §§ 701–706 (1994). The proper standard is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based on the administrative record. *See* 5 U.S.C. § 702, 706(2)(A).

A successful bid protest bears a "heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973). The Federal Circuit articulated a similar view when it said: "[T]o prevail in a protest, a protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

A Motion for Judgment on the Administrative Record is treated under the Rules of the U.S. Court of Federal Claims (RCFC) as a motion for summary judgment. *RCFC 56.1* Summary judgment is appropriate where there are no genuine issues as to any material fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### *FACTS*

The Army Corps of Engineers issued Request for Proposals No. DACA21–00–R–0030, D–Area Barracks Upgrade, Phase III, Fort Bragg, North Carolina, on August 11, 2000 for the renovation of existing barracks for the 82nd Airborne Division over the next several years.

The solicitation indicated that the award "will be made to the technically acceptable lowest price offeror whose price was determined to be fair and reasonable without discussion of such offers" and that "[p]rices submitted will be evaluated only after determination of those offerors submitting acceptable technical proposals based on the GO/NO–GO technical evaluation." The technical factors for evaluation included in the solicitation were as follows: (1) Experience, (2) Past Performance, (3) Effectiveness of Management, and (4) Compliance with Safety Standards. All of these factors, and various subfactors listed in the solicitation were required to be evaluated on a GO/NO–GO basis. Any bidder who received a NO–GO on any factor or sub-factor would be eliminated from the competition.

The solicitation identified the sources of information for each of the evaluation factors: (1) communication with the points of contact listed by the offeror; and/or (2) other data available to the Government pertinent to this work. The U.S. Army Corps of Engineers' Construction Contractor Appraisal Support System (CCASS) was specifically cited in the solicitation as a source of information for evaluating bidders. According to the Army Corps, CCASS "is a centralized and automated data base performance evaluation information on DOD construction contractors." US Army Corps of Engineers Regulation 415–1–17.

The solicitation included Federal Acquisition Regulation ("FAR") 52.0020–4101 stating that "[p]rices submitted will be evaluated only after determination of those offerors submitting acceptable technical proposals based on the GO/NO–GO technical evaluation." Invoking FAR clause 52.215–1(f)(4), the solicitation also notified offerors that the Army would award the contract without discussion. Finally, the solicitation indicated that "[p]rices submitted will be evaluated only after determination of those offerors submitting acceptable technical proposals based on the GO/NO–GO technical evaluation."

TLT was the low-bidder out of five offerors who timely submitted a bid in response to the solicitation on September 11, 2000. The Army's Technical Evaluation Teams ("TET") evaluated the offers and found TLT to be technically unacceptable under the terms of the solicitation. In evaluating offers, the TET reviewed data from several sources, including but not limited to CCASS data, performance surveys and weekly reports.

On September 11, 2000, McCarty Corporation submitted its proposal on the project. McCarty Corporation was founded in 1964 and operated as a national firm working as a mechanical contractor and subsequently as a general contractor. Texas–Capital Contractors, Inc. ("Texas–Capital") was founded in 1982 as a separate corporation. On January 1, 2001, Texas–Capital was merged into McCarty Corporation with McCarty Corporation as the survivor.

By letter dated December 20, 2000, the Army officially notified TLT of their elimination from award consideration for receiving an overall NO–GO rating. By letter dated December 21, 2000, the Contracting Officer ("CO"), Lucy J. Lanier, notified TLT that a contract award was being made under the solicitation to the McCarty Corporation.

TLT subsequently filed a post-award protest action with the General Accounting Office on January 8, 2001. TLT withdrew the protest and filed in this court on February 21, 2001. The defendant postponed further

action on the contract until April 23, 2001 to permit this bid protest to be adjudicated.

### DISCUSSION

#### Count I.

█ Plaintiff protests the award alleging that the government's CO violated a standard of reasonableness by not conducting discussions with TLT about adverse past performance records, in addition to other allegations outlined below. The CO arrived at her NO–GO rating using CCASS data, performance surveys, personal knowledge, and weekly reports. All of these sources contain information from which a rational person could conclude that TLT's performance on certain contracts was problematic at times.

The rating scheme articulated in the solicitation document presents a fairly rigorous and specific set of evaluation criteria. Using the GO/NO–GO rating scheme, both the CO and the TET arrived at a NO–GO determination for TLT. Nothing in the record suggests that the CO should have suspected that any of the information was erroneous and both parties agree that agencies have broad discretion whether to communicate with a firm concerning its past performance. *See A.G. Cullen Construction, Inc.*, B–284049.2, February 22, 2000, 2000 CPD ¶ 45. To the contrary, the CO knew the contractor quite well, having supervised at least eight contracts according to plaintiff's counsel.

It is not appropriate for this court to look into the mind of the CO and substitute its own judgment, but merely to consider whether a rational basis exists for the agency action in question. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 557–58, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Put another way, if the court finds a reasonable basis for the agency's action, the court should stay its hand, even though with the same evidence before it the court might have reached a different conclusion. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). This decision is within the CO's discretion and the court finds no basis upon which to conclude that it was arbitrary and capricious.

The second prong of the *Kentron* formulation allows a bid protest to be sustained if the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. Here, the court finds that the government violated U.S. Army Corps of Engineers Regulation No. 415–1–17, by failing to follow the specific procedures outlined therein. At oral argument, plaintiff's counsel noted that the Army failed to respond to TLT's repeated requests for clarification of its past performance ratings. This regulation provides specific procedures for handling plaintiff's reevaluation request. However, the plaintiff was not prejudiced by this regulatory failure because the CO and TET would have reached the same NO–GO rating based on their evaluation of the performance surveys and weekly reports. Since TLT would have been eliminated from the competition with or without the interim ratings, the court is unable to find any prejudice. Thus, the court does not consider these negative interim performance reviews in reaching its decision.

#### Count II.

Plaintiff also alleges that the government's failure to pursue discussions over its past performance amounted to a de facto debarment and a deprivation of constitutional due process in that plaintiff was not given an opportunity to clarify alleged errors in the past performance records.

█ De facto debarment occurs when an agency bars a contractor from competing for government contracts for a certain period of time without following the applicable debarment procedures found in the Federal Acquisition Regulations. *See* 48 C.F.R. § 9.406–3. In brief, the regulations require that an agency provide the contractor with a notice and opportunity to be heard prior to debarment.

█ Previous courts considering this matter have established a high standard for plaintiffs to meet when trying to establish a de facto debarment claim. To succeed, TLT must demonstrate a "systematic effort by the procuring agency to reject all of the bidder's contract bids." *Stapp Towing, Inc. v. United States*, 34 Fed.Cl. 300, 312 (1995). Two op-

tions exist to establish a de facto debarment claim: 1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts. *CRC Marine Serv., Inc. v. United States*, 41 Fed.Cl. 66, 84 (1998).

■ TLT offered no clear evidence that it was being disqualified from government contracts on a systematic basis. No government statement has been offered by the plaintiff that meets the first prong of the *CRC Marine* test. In addition, as the government's opposition brief points out, the Army awarded TLT two contracts, albeit smaller and of a different nature, during the same time frame in which the contract at issue was being evaluated. In support of its proposition, plaintiff cites a disqualification for projects at Fort Stewart, Georgia and Cieba, Puerto Rico. These instances, if and when coupled with others, may at some point in the future create a clear pattern of de facto debarment. But at this juncture, based on this evidence, the court is unwilling to agree that any systematic pattern of debarment has occurred. Moreover, since no de facto debarment has been found, the plaintiff's claim that its constitutional due process rights were violated must fail.

### Count III.

Plaintiff's remaining claim is that the government violated the Competition in Contracting Act of 1984 (CICA) by treating offerors unequally. Plaintiff's argument is that the successful offeror, the McCarty Corporation, should have been disqualified for relying on the past performance of an affiliate company, Texas–Capital, Inc, that also had received an unsatisfactory rating in CCASS for a relevant technical factor.

■■ A fundamental principle of government procurement is that CO's treat all offerors equally and consistently apply the evaluation factors listed in the solicitation. *See* 10 U.S.C. § 2305 (1999). As intervenor points out however, even if the evaluation is faulty, the plaintiff must show that there is a substantial chance that it would have received the award but for the faulty evaluation. *See Statistica v. Christopher*, 102 F.3d

1577, 1582 (Fed.Cir.1996) As stated above, sufficient information exists to conclude that TLT would not have been awarded the contract. Further, however, it appears that the CO has a sufficient basis for considering McCarty and Texas–Capital separate legal entities. Apart from one ambiguous statement by Mr. McCarty, who was not a lawyer, and the fact that McCarty acquired Texas–Capital after the award to McCarty, it seems clear that McCarty would have gotten the award on its own bid. Thus, the failure of the CO to consider information on one contract negative to Texas–Capital in its award to McCarty was reasonable and not a violation of CICA.

### Conclusion

Plaintiff's Motion for Judgment on the Administrative Record in which it sought injunctive relief and a declaratory judgment is DENIED. Defendant's Motion for Judgment on the Administrative Record is GRANTED. The Clerk of the Court is directed to enter judgment for the Defendant and dismiss the complaint.

This opinion shall be published as issued after May 25, 2001 unless the parties identify protected and/or privileged material for redaction prior to the date of publication. Any requests for redaction must be specifically cited and explained to the court, which will consider the request in accordance with the court's protective order procedures.

**IT IS SO ORDERED.**