**OTI AMERICA, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 05–904C.**

United States Court of Federal Claims.

Sept. 23, 2005.

William M. Weisberg, Sullivan & Worcester LLP, Washington, D.C. for plaintiff. With him on the briefs were Beth L. Jacobson and Joshua L. Solomon, Sullivan & Worcester LLP, Boston, MA.

James R. Whitman, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him on the briefs were Assistant Attorney General Peter D. Kiesler, David M. Cohen, Director, and Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Washington, D.C. Of counsel was Jennifer R. Seifert, Assistant General Counsel, Government Printing Office, Washington, D.C.

## OPINION AND ORDER [1]

LETTOW, Judge.

Plaintiff, OTI America, Inc. ("OTI") has presented a bid protest that does not fit neatly into either of the two standard categories of such cases, i.e., a pre-award protest of a proposed procurement or a post-award protest of a contractual award. OTI seeks to invoke the jurisdiction of this court to protest a decision by the Government Printing Office ("GPO") to cease making any further orders of samples or product from OTI under a previously issued multi-award contract for development of electronic passport covers, preparation of prototypical covers, and production of such covers. Compl. ¶¶ 9–31. OTI avers that its elimination from future orders for prototypes and production of passport covers under the government's Electronic Passport program was contrary to law and that GPO's actions were irrational and arbitrary. Id. In response, the government has filed a motion to dismiss for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), arguing that OTI's claim is improperly presented under this court's bid-protest jurisdiction. Defendant's Motion to Dismiss ("Def.'s Mot.") at 1. The government contends that OTI's claims should be regarded as a matter of contract administration, id. at 8–9, and that at most OTI has a garden-variety claim for breach of contract.[2]

On the same day it filed its complaint, OTI filed an application for a temporary restraining order and a motion for expedited limited discovery ("Pl.'s Disc. Mot."). The court held a hearing on August 22, 2005 at which it denied the request for a temporary restraining order without prejudice for four separate reasons: jurisdiction was uncertain, only redacted materials were available to the court at the time and OTI consequently had difficulty showing a likelihood of success on the merits, OTI had made an insufficient showing of irreparable harm, and equitable relief might disserve national security interests. Hr'g Tr. 57:5 to 59:25 (Aug. 22, 2005). By consent of the parties, briefing of plaintiff's discovery motion was scheduled to proceed concurrently with briefing on the government's motion to dismiss. The government has deferred submission of the administrative record of the procurement pending resolution of its motion to dismiss. Hr'g Tr. 16:6 to 17:8, 21:2 to 22:2 (Aug. 22, 2005).

In accord with 28 U.S.C. § 1491(b)(3),[3] the court expedited briefing on the government's

---

1. Because this opinion and order might have contained "confidential or proprietary information" within the meaning of Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, it was first issued under seal. Submissions were filed by the parties on September 28, 2005, indicating that no redactions were necessary. Consequently, the only changes to this opinion and order from that originally issued are to the text of this footnote.

2. GPO is an agency of the legislative branch and as such is not subject to the Contract Disputes Act, 41 U.S.C. §§ 601–613. See Tatelbaum v.

United States, 749 F.2d 729, 730 (Fed.Cir.1984); Fry Communications, Inc. v. United States, 22 Cl.Ct. 497, 502–03 (1991). Accordingly, the government contends that OTI could have brought a claim for breach of contract directly to this court without first presenting it to the Contracting Officer. Def.'s Mot. at 10 n. 4.

3. Subsection (b) of 28 U.S.C. § 1491, the Tucker Act, sets out this court's bid-protest jurisdiction. Paragraph (3) of the Subsection provides that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national securi-

motion to dismiss and OTI's motion for discovery, and a hearing on the motions was held on September 2, 2005. Those matters are now ready for decision. For the reasons stated below, both the government's motion to dismiss and the plaintiff's motion for discovery are denied.

## BACKGROUND [4]

On July 12, 2004, GPO issued solicitation GPO–EP2004 for the purpose of procuring electronic, integrated, circuit-embedded passport covers in conjunction with the U.S. Department of State's Electronic Passport program. Compl. ¶ 9; Defendant's Notice of Filing of Additional Material Requested by the Court ("Def.'s Supp."), Ex. 2 (GPO–EP2004 Solicitation) ("Solicitation") § C1.1. The goal of the Electronic Passport program is to create a new version of the U.S. pass-

ty and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).

**4.** The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motions.

**5.** As amended, the statute provides:
§ 1732. Machine-readable, tamper-resistant entry and exit documents
(a) Report
(1) In general
Not later than 180 days after May 14, 2002, the Attorney General, the Secretary of State, and the National Institute of Standards and Technology (NIST), acting jointly, shall submit to the appropriate committees of Congress a comprehensive report assessing the actions that will be necessary, and the considerations to be taken into account, to achieve fully, not later than October 26, 2004—
(A) implementation of the requirements of subsections (b) and (c) of this section; and
(B) deployment of the equipment and software to allow biometric comparison and authentication of the documents described in subsections (b) and (c) of this section.
. . .
(b) Requirements
(1) In general
Not later than October 26, 2004, the Attorney General and the Secretary of State shall issue to aliens only machine-readable, tamper-resistant visas and other travel and entry documents that use biometric identifiers. The Attorney General and the Secretary of State shall jointly establish document authentication standards and biometric identifiers standards to be employed on such visas and other travel and

port, to be used by all Americans, that increases security, resists tampering, and expedites processing at all entry points along the U.S. border. Def.'s Mot. at 2; Solicitation § C1.1. Development of an electronically enhanced passport was contemplated by Congress when it passed Section 303 of the Enhanced Border Security and Visa Entry Reform Act, Pub.L. No. 107–173, 116 Stat. 543 (2002), whereby the government imposed a deadline of October 26, 2005 on countries whose citizens do not require a visa to enter the United States to have a program in place to create and issue "machine-readable passports that are tamper resistant and incorporate biometric and document authentication identifiers." 8 U.S.C. § 1732(c)(1), *amended by* Act of Aug. 9, 2004, Pub.L. No. 108–299, 118 Stat. 1100, 1100 (2004).[5] In effect, the

entry documents from among those biometric identifiers recognized by domestic and international standards organizations.
(2) Readers and scanners at ports of entry
(A) In general
Not later than October 26, 2005, the Attorney General, in consultation with the Secretary of State, shall install at all ports of entry of the United States equipment and software to allow biometric comparison and authentication of all United States visas and other travel and entry documents issued to aliens, and passports issued pursuant to subsection (c)(1) of this section.
. . .
(c) Technology standard for visa waiver participants
(1) Certification requirement
*Not later than October 26, 2004, the government of each country that is designated to participate in the visa waiver program established under section 1187 of this title shall certify, as a condition for designation or continuation of that designation, that it has a program to issue to its nationals machine-readable passports·that are tamper resistant and incorporate biometric and document authentication identifiers that comply with applicable biometric and document identifying standards established by the International Civil Aviation Organization.* This paragraph shall not be construed to rescind the requirement of section 1187(a)(3) of this title.
(2) Use of technology standard
On and after October 26, 2005, any alien applying for admission under the visa waiver program under section 1187 of this title shall present a passport that meets the requirements of paragraph (1) unless the alien's passport was issued prior to that date. . . .
8 U.S.C. § 1732 (emphasis added).
Bills have been introduced in Congress to extend the deadline for implementation of the Elec-

government is developing electronic passports that apply the same standards as those created for foreign nations. Solicitation § C1.1.[6]

The solicitation contemplated and established a competition among qualifying offerors. Under the solicitation, GPO implemented a procurement consisting of multiple contracts, each containing sequential qualifying steps, for development of an electronic passport, preparation and testing of prototypes, and a final procurement of electronic passport covers. Def.'s Mot at 2–3. According to the Solicitation, GPO "anticipate[d] awarding a contract to the Offeror(s) whose proposal is the most advantageous to the Government, price and other factors considered." Solicitation § M.1(a). Eighteen offerors submitted initial bids to GPO, and a number of those offerors were awarded one-year contracts, with four option years. Def.'s Mot. at 2;[7] *see also* Hr'g Tr. 6:18 to 7:2 (Aug. 22, 2005). OTI was included among the offerors, and it eventually was awarded a contract. Def.'s Mot. at 14.[8]

Each contract has various line-item numbers ("CLINs") which indicate the particular products or services needed for the various stages of development, testing, evaluation, and production. Solicitation § B3. The government noted that it would purchase from a contracting party at least the minimum amount of product listed under "MANDATORY" CLINs, and would reserve the right to purchase any amount, or none at all, for "OPTIONAL" CLINs. *Id.* § B2. The government provided compensation to contrac-

tors for the products and services purchased under the various CLINs, including those prototypes that were being purchased for testing and evaluation. Hr'g Tr. 41:22–24 (Sept. 2, 2005). The purpose of these payments was to defray at least part of the expense incurred by the contractors in developing and producing this new product. Hr'g Tr. 41:13 to 42:9 (Sept. 2, 2005). The government has conceded that a single award of the ultimate full production was "possible," but multiple awards were "anticipated," although only one contractor was likely to receive the bulk of the orders. Solicitation §§ B1.2, C1.2.8.

These multiple-award contracts delineated four stages of testing and head-to-head evaluation of each contractor's proposed electronic-passport book cover. Solicitation § C1.3. At stages one and two, GPO determined whether the contractors' proposed electronic covers satisfied certain objective criteria, but the government concedes that testing stages three and four contain an "element of competition" between different parties' products. Def.'s Mot. at 15; *see* Hr'g Tr. 20:20–24 (Sept. 2, 2005). GPO has completed the first two testing stages, and it apparently has embarked, or is about to embark, on stage three (CLIN 0005), a pilot program addressed *infra. See* Hr'g Tr. 23:16 to 24:18 (Aug. 22, 2005); Hr'g Tr. 23:16 to 24:7 (Sept. 2, 2005); Solicitation § B3, CLIN 0005.

Stage one required that each party certify and provide evidence that their proposed electronic-passport cover met certain inter-

tronic Passport program. *See* S. 1124, 109th Cong. (2005) (proposing to extend the deadline by one year); S. 1438, 109th Cong. (2005) (proposing to extend the deadline by two years); H.R. 2628, 109th Cong. (2005) (proposing to extend the deadline by one year).

6. The Solicitation stated "the goal of issuing all new passports (more than eight million annually) as E[lectronic] P[assport]s by the end of December 2005." Solicitation § C1.3.4.

7. GPO did not initially choose this method of procurement in selecting passport covers for the Electronic Passport program. It first attempted to issue a task-order request to four contractors that held one of a series of indefinite-delivery/indefinite-quantity contracts with the General Services Administration for "Smart Cards" intended

to provide "visual identification, physical access control and logical access control functions on a single card." *See Matter of Anteon Corp.*, B–293523, B–293523.2, 2004 CPD P 51, 2004 WL 626220, at *2 (GAO Mar. 29, 2004). A successful bid protest, *id.* at *5, caused the government to abandon that process and create the one at issue before the court.

8. OTI avers that it is a company that "specializes in the design and production of electronic identity cards and related products." Plaintiff's Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction ("Pl.'s Opp'n") at 2. GPO initially eliminated OTI from the competition. After OTI filed a protest and supplemental protest with the Government Accountability Office ("GAO"), Compl. ¶¶ 14–16, GPO reversed itself and permitted OTI to proceed with a contract. Compl. ¶ 17.

national technical standards, which certification the government could, in its discretion, take action to verify and confirm. Solicitation §§ B3, C7.2.3.1. Seven kits were to be provided by each contractor. *Id.* § B3, CLIN 0001. Thereafter, at stage two, each contractor was to provide 700 electronic-passport book cover sheets, and the government tested and inspected these sample products for book fabrication, security, durability, assembly, functionality, fraud prevention, and compatibility with the government's printers. *Id.* §§ B3, CLIN 002, C1.2.5, 7.2.3.1. Testing at this stage required the contractors' sample products to satisfy the "stated technical and security requirements." *Id.* § C1.3.2. The sample products that passed this testing regime advanced to the next level, at which GPO decided whether to exercise the option on the next CLIN to one or multiple parties. *Id.* § C1.2.6.[9]

Stage three of the contracts encompasses two six-month pilot programs, the Special Issuance Agency ("SIA") Pilot for travel by government employees and the Domestic Agency Pilot for a limited number of U.S. citizens at designated airports. During the pilot programs, prototypes produced by each selected contractor will be tested under field conditions with the cooperation of the U.S. Department of Homeland Security and certain foreign governments to evaluate the "durability and interoperability" of the passport book covers. Solicitation §§ B3, CLIN 0005, C1.2.6, C1.2.7, C1.3.3, C7.2.3.1. At this stage, further laboratory testing may be conducted to examine the prototype products' structural integrity, response to environmental conditions, and effectiveness over their required ten-year life span after being subjected to accelerated physical aging. *Id.* § C7.2.3.1.

At stage four, the government reserves the right to conduct additional testing for quality and new configurations. Solicitation § 7.2.3.1.

Finally, GPO will initiate the final phase of the Electronic Passport program for "full agency deployment." Solicitation §§ B3,

CLIN 0006, C1.3.4, C7.2.3.1. The GPO anticipates, per the Solicitation, that full deployment will introduce newly produced electronic U.S. passports to all domestic government agencies who did not participate in the SIA Pilot, and that more than eight million passports will be provided to issuing agencies such as the Department of State's Bureau of Consular Affairs. *Id.* §§ C1.1, C1.3.4. Throughout the contract, the government has reserved the right to "place orders for deliverables in any quantity, to any of the [contractors], at any time." *Id.* § C1.2.8.

GPO ordered from OTI, and OTI delivered, sample electronic-passport book covers at the second stage of the contract, and GPO paid for the covers that OTI delivered. Def.'s Mot. at 3. During the initial testing of the OTI's samples, GPO discovered two defects: the covers were too thick and software was defective. Compl. ¶ 22. GPO sent a cure notice to OTI, and OTI subsequently delivered a second set of sample electronic passport covers that no longer exhibited the flaws previously noted by GPO. However, OTI's second set of covers suffered from a new defect. Compl. ¶¶ 23–26. Prior to testing the compatibility of OTI's samples on the government's printers, the covers began to separate due to a flaw in the adhesive used by OTI to assemble the covers. Hr'g Tr. 47:24 to 48:4 (Sept. 2, 2005); Compl. ¶ 26; *see also* Pl.'s Disc. Reply Ex. B (Letter from Albertha Broadnax, GPO Contracting Officer, to Ohad Bashan, President and CEO of OTI (May 18, 2005)). OTI thereafter learned that a supplier had provided defective adhesive due to the use of a mislabeled chemical. Compl. ¶ 27. OTI informed GPO of the reason for the defect and provided corrected samples. Compl. ¶ 28. On May 18, 2005, GPO informed OTI that it would no longer purchase any additional products under the contract because OTI had failed to "meet the contract requirements." Def.'s Mot. at 4; Pl.'s Disc. Reply Ex. B.

Thereafter, OTI filed a protest with GAO concerning the action taken by GPO. *Matter of OTI America, Inc.,* B–295455.3, 2005 WL

---

9. CLINs 3 and 4 relate to production of readers and writers for GPO and provision of technical support to GPO, and thus relate indirectly to actual book covers. *Id.* § B3, CLIN 0003 and CLIN 0004.

1994254 (GAO Aug. 10, 2005). On August 10, 2005, GAO denied the protest after concluding that OTI "was not treated unfairly." *Id.*, at *5. OTI then filed its redacted complaint in this court on August 17, 2005.

## STANDARD FOR DECISION

Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the plaintiff, OTI bears the burden of establishing the court's subject-matter jurisdiction over its claims. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). In determining whether jurisdiction exists in a particular case, the court must accept as true the facts pleaded in the complaint and "draw all reasonable inferences in favor of the plaintiff." *Goel v. United States*, 62 Fed.Cl. 804, 806 (2004) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995)).

## ANALYSIS

### A. Subject–Matter Jurisdiction

■ As a general matter, all "federal courts are courts of limited jurisdiction." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed.Cir.1998). This court is no exception. Since January 1, 2001, this court has had exclusive jurisdiction over bid protests under Subsection (b) of the Tucker Act, 28 U.S.C. § 1491(b), added by the Administrative Dispute Resolution Act, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) ("ADRA").[10] In relevant part, Paragraph (1) of that Subsection provides that

(1) *the United States Court of Federal Claims ... shall have jurisdiction* to ren-

der judgment *on an action* by an interested party *objecting to* a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphasis added). *See also PGBA, LLC v. United States*, 389 F.3d 1219, 1224 (Fed.Cir.2004); *Banknote Corp.*, 365 F.3d at 1350; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001). In essence, the ADRA confers on this court jurisdiction over three types of actions that are commonly termed "bid protests." In the words of the statute, the first is "an action ... objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award ... of a contract," 28 U.S.C. § 1491(b)(1), *i.e.*, a pre-award protest. The second is "an action ... objecting ... to ... the award of a contract," *id., i.e.*, a post-award protest. The third is "an action ... objecting ... to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.*[11]

As suggested at the outset, the first two categories of this court's bid-protest jurisdiction, a pre-award protest or a post-award protest, are well recognized and relatively standard proceedings. The third category of this court's bid-protest jurisdiction is more amorphous and indefinite and is typically invoked chiefly in "override" cases. *See, e.g., RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1288–89 (Fed.Cir. 1999). Override cases involve instances where a bid protest is filed with GAO triggering an automatic stay of the procurement action under the Competition in Contracting Act, 31 U.S.C. §§ 3551–56. That Act allows the procuring agency to override the automatic stay if certain findings regarding exi-

---

10. Prior to January 2001, this court shared jurisdiction over bid protests with district courts. *See id.* § 12(d), 110 Stat. at 3874–75 (sunset provision); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004).

11. *See also Labat–Anderson, Inc. v. United States*, 346 F.Supp.2d 145, 148–54 (D.D.C.2004) (applying the sunset provision eliminating concurrent jurisdiction of federal district courts to hear cases arising under Subsection 1491(b) to circumstances arguably within the third portion of Paragraph (1) of that Subsection).

gent circumstances are made in writing by the head of the procuring activity. *See* 31 U.S.C. §§ 3553(c)(2), (d)(3)(C). The Federal Circuit's decision in *RAMCOR* held that an agency's decision to override the automatic stay was reviewable in this court under the third prong of Paragraph (1) of Subsection 1491(b). Otherwise, the precedents concerning the scope of Paragraph (1) of Subsection 1491(b) are sparse. Besides this court's recognized jurisdiction to address override cases, the third prong of Paragraph (1) of Subsection 1491(b) has come into play when an agency endeavored to expand the scope of a contract to make a new procurement without competitive bidding. *See CCL, Inc. v. United States,* 39 Fed.Cl. 780, 788–89 (1997). The *CCL* decision was cited approvingly by the Federal Circuit in *RAMCOR. See RAMCOR,* 185 F.3d at 1289.[12] In all events, the third prong of Paragraph (1) of Subsection 1491(b) is not limited to override cases.

The question presented by this case is whether the third, concluding prong of Paragraph (1) of Subsection 1491(b) embraces yet a further situation such as this one where the agency has entered into identical multi-award contracts that essentially involve a competition in stages to develop a new product, and ultimately to procure that product, and the protest concerns objections to the agency's actions in eliminating one of the competitors at an intermediate stage. In short, does the expansive language of the concluding portion of Paragraph (1) reach sufficiently far to encompass this case.

The third, concluding prong of Paragraph (1) has been given a broad interpretation. *See RAMCOR,* 185 F.3d at 1289 ("The operative phrase 'in connection with' [a procurement or a proposed procurement] is very sweeping in scope."). Moreover, Congress has defined the term "procurement" to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion

and closeout." 41 U.S.C. § 403. Furthermore, when Congress enacted the ADRA in 1996, adding subsection (b) to the Tucker Act, its goal was to grant this court jurisdiction "over the full range of procurement protest cases." H.R. CONF. REP. 104–841, at 10 (1996).

Neither the parties nor the court have been able to locate a precedent that directly addresses this jurisdictional matter. Hr'g Tr. 22:15 to 23:3, 38:12 to 39:16, 61:4–9 (Sept. 2, 2005). Apart from the *RAMCOR* and *CCL* decisions, the parties offer three separate lines of cases as possible guideposts for a decision: (1) *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99 (2001), *see* Pl.'s Opp'n at 9–10; (2) *Matter of Electro–Voice, Inc.,* B–278319, B–278319.2, 98–1 CPD 23, 1998 WL 14952 (GAO Jan. 15, 1998), *see* Pl.'s Opp'n at 11–12; and (3) *Davis/HRGM Joint Venture v. United States,* 50 Fed.Cl. 539 (2001), *see* Def.'s Mot. at 11. These cases proffered by the parties are instructive, and the court concludes that one of the three lines of precedent, *Electro–Voice,* points strongly toward a particular result in this case.

In *Labat–Anderson,* this court held that it had subject-matter jurisdiction to decide whether the government had acted improperly when it awarded a Blanket Purchase Agreement to a party holding a Federal Supply Schedule ("FSS") contract with the General Services Administration ("GSA"). 50 Fed.Cl. at 103–105. The FSS program allows government agencies, through a "simplified process," to obtain commonly used "commercial supplies and services." 48 C.F.R. § 8.402(a) (2005). When an agency decides to order a particular product or service through the FSS, it selects a contractor from the pre-approved list and may either place a task order or enter into a Blanket Purchase Agreement with that contractor. *Id.* § 8.402(a), (b). Such an Agreement is a "simplified method of filling anticipated repetitive needs for supplies or services by

---

12. The facts in the *CCL* case bear obvious similarities to the facts of an earlier bid protest respecting this procurement. *See supra,* at 111 n. 7 (discussing *Matter of Anteon Corp.,* 2004 WL 626220). *See also Corel Corp. v. United States,* 165 F.Supp.2d 12, 22 (D.D.C.2001) (finding that the concluding portion of Paragraph (1) of Subsection 1491(b) applies to a challenge by a software company to a decision to convert exclusively to Microsoft software without a full and open competition).

establishing 'charge accounts' with qualified sources of supply." *Id.* § 13.303–1. In *Labat–Anderson,* the procuring agency issued a Request for Quotations for administrative services to be provided at service centers of the Immigration and Naturalization Service ("INS"). The Request for Quotations indicated that responsive proposals would be evaluated regarding price under 48 C.F.R. § 15.404 and would be rated regarding technical aspects in accord with 48 C.F.R. § 15.301. After evaluating bids from four offerors who each held FSS contracts with GSA, INS decided to enter into a Blanket Purchase Agreement with a contractor other than the protestor. 50 Fed.Cl. at 100–02. The court ultimately found that it had jurisdiction over the protest because the award of a Blanket Purchase Agreement to another bidder who had responded to the Request for Quotations corresponded to one of the "stages" of the procurement process. The court observed that the selection of one bidder over another as the supplier for a particular service occurred "after the [procuring agency] 'determined a need for ... services,' the point at which the procurement process begins." *Id.* at 104. Consequently, the court held that the case fell within the scope of this court's jurisdiction under the third, concluding portion of Paragraph (1) of Subsection 1491(b). *Id.*

OTI draws an analogy between their situation, in which the government decided to cease all future orders, to that of the plaintiff in *Labat–Anderson.* Pl.'s Resp. at 10. However, the court is not convinced that the two cases are as similar as OTI asserts. In *Labat–Anderson,* no contractual relationship was ever formed between the plaintiff and the procuring agency, and, as a result, no performance ever took place. *See* 50 Fed.Cl. at 102. Here, OTI has a contract for a discrete product, and the government's decision to cease ordering electronic passport covers from OTI essentially forecloses any possibility that OTI will secure any future benefit from the contract. Nonetheless, the parties have both already performed under

the contract during stages one and two because the government ordered a limited number of samples, OTI delivered them, and OTI was paid accordingly. Def.'s Mot. at 3; Solicitation §§ C1.2.4, C1.2.5. *Labat–Anderson* is thus distinguishable on that ground.[13] Notably, in this case there was a contract between OTI and GPO and that contract was performed insofar as its mandatory terms were concerned, notwithstanding that identical contracts were issued to other contractors and that the contracts themselves set up a competition for a final award or awards.

OTI also argues that GAO's decision in *Matter of Electro–Voice, Inc.,* provides support for its contention that this court has subject-matter jurisdiction. Pl.'s Opp'n at 11–12. In *Electro–Voice,* two firms had received multiple award schedule ("MAS") contracts with indefinite-delivery/indefinite quantity terms for the production and delivery of helmets with communications devices for crewmen of advanced combat vehicles. *Electro–Voice,* 1998 WL 14952, at *1. MAS contracts are "for similar or comparable supplies, or services, established with more than one supplier, at varying prices." 48 C.F.R. § 8.401; *see* 41 U.S.C. § 253*h*(d)(1)(B). The contracts at issue in *Electro–Voice* included an initial line item for production and delivery of four demonstration models that were to be used in testing to determine the "downselected" contractor, *i.e.,* the contractor chosen for continued performance. *Electro–Voice,* 1998 WL 14952, at *1. The "downselection" would be made on a best-value basis. *Id.* After evaluating the demonstration helmets, the Army issued a delivery order for production of helmets from one of the firms, and the other firm filed a protest with GAO. *Id.,* at *3. GAO upheld its jurisdiction to hear the protest. It held that "[i]n cases where the terms of existing contracts are used to conduct a competition resulting in the elimination of contractors as sources for the agency's requirements for the duration of the contracts in question, as is the case here, we will consider protests concerning that compe-

**13.** Also, the plaintiff in *Labat–Anderson* continued to hold an FSS contract with GSA, and its failure to be granted a Blanket Purchase Agreement by the INS did not preclude it from receiving task orders and Purchase Agreements by other government agencies under its FSS contract in the future. *See* 48 C.F.R. § 8.405–3.

tition and selection decision." *Id.*, at \*4 (citing *Mine Safety Appliances Co.*, 69 Comp. Gen. 562, 564 (GAO July 5, 1990), 90–2CPD ¶ 11 at 4). Upon review of the Army's procurement decision, however, GAO denied Electro–Voice's protest. *Electro–Voice*, 1998 WL 14952, at \*6.

The rationale employed by GAO in *Electro–Voice* has direct parallels to this case. In this case also, the terms of existing contracts are being used to conduct a competition resulting in the elimination of some contractors as further sources of the agency's requirements and the selection of other contractors as sources for those requirements. The resulting question is whether this rationale fits within the parameters of the third portion of Paragraph (1) of Subsection 1491(b). In that respect, there seems to be no doubt that the competition between and among contractors for an ultimate award occurs "in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Furthermore, it makes no difference under the ADRA that contracts have been previously awarded and that the ultimate procurement occurs as the last stage of contractual performance because the statute provides that "the United States Court of Federal Claims ... shall have jurisdiction to entertain such an action [*i.e.*, a bid protest] without regard to whether suit is instituted before or after the contract is awarded." *Id.* Consequently, on the face of the statute, this court seemingly has jurisdiction to hear this case as a protest. Nonetheless, the further question arises whether Paragraph (1) of Subsection 1491(b) carries with it an implied exception for cases that could be brought directly under the Tucker Act, 28 U.S.C. § 1491(a), as a claim for breach of contract. That in effect is the thrust of the government's reliance on a third line of precedents.

The government argues that this court should apply the reasoning in *Davis/HRGM Joint Venture v. United States*, 50 Fed.Cl. 539 (2001), and remit OTI to an action under Subsection 1491(a) for breach of contract. *See* Def.'s Mot. at 11–13. In *Davis*, plaintiff was the successful bidder under a solicitation issued by the Army Corps of Engineers and was awarded a contract to modernize a school building. *Id.* at 541. As part of the solicitation's terms, a bid bond had to be filed. *Id.* The plaintiff, however, had improperly filed such a bond because the principal identified in the bond was different than the party identified in the bid. *Id.* at 541–42. This defect was identified in a bid protest that was dismissed as being untimely because the bid bond had been superseded by proper performance and payment bonds. *Id.* at 542. Nonetheless, after dismissal of the bid protest, the contracting officer relied on the defect in the bid bond to terminate the plaintiff's contract for convenience. *Id.* at 543. The terminated contractor brought a post-award bid protest in this court, but the court held that the "[p]laintiff's challenge to the termination for convenience does not fall within the express language of § 1491(b)" and thus the court had no jurisdiction to consider the matter in the manner by which it had been presented. *Id.* at 544–45. In *Davis*, the court found "persuasive" the reasoning of the U.S. Court of Appeals for the D.C. Circuit in a decision holding that a trial court lacked jurisdiction "over a termination for convenience claim brought under its bid protest statute." *Id.* at 545 (citing *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C.Cir.1985)). *See also* Def.'s Reply at 9 (citing *Chapman Law Firm v. United States*, 63 Fed.Cl. 519 (2005), as an instance where a contractor's failure to meet a bonding requirement was a matter of contract administration that did not fall with the court's bid-protest jurisdiction).

By contrast, here, GPO effectively ended OTI's contract by choosing not to order any product from OTI under optional CLINs, Def.'s Mot. at 4, but the competition for orders under CLIN 0006, GPO's procurement of its full requirements for electronic passport covers, continues with the remaining contractors. *See id.* at 15; Solicitation §§ B3 (CLIN 0006), C1.3.4. *Davis* is thus distinguishable, and the circumstances of this case do not seem to fall within any implied exception in the ADRA for cases that could have been brought as claims for breach of contract, even assuming that such an exception exists.

This conclusion does not resolve the jurisdictional dispute, however, because in this case the government also resists importation of the *Electro–Voice* rationale into Subsection 1491(b)(1) on the ground that GPO's decision not to exercise any future CLINs was based on the incompatibility of OTI's proffered product samples with certain contract specifications. Def.'s Mot. at 16–17. The government argues that a bid protest is improper because, at the time of OTI's elimination, its sample product was not being compared to any other offeror's product. *Id.* at 13–15 (envisioning the possible existence of jurisdiction for a bid protest filed by OTI had it been eliminated as the result of GPO's decision to not exercise one of the final two CLINs); *see also* Solicitation §§ B3, CLINs 0005, 0006, C1.2.6. The government recites that Section C1.2.6 of the Solicitation states that GPO will only exercise CLIN 0005 to those contractors whose proposals "meet contract specifications," and it contends that this portion of the Solicitation implies that a contractor's failure to satisfy the requirements described in Section C7.2.3 means it will not be awarded any orders under this CLIN. Def.'s Mot. at 17. *See* Def.'s Reply at 4; Solicitation §§ B3, CLIN 0005, C1.2.6, C7.2.3.

The distinction urged by the government is unavailing. If this were a typical procurement, disqualification of an offeror during the procurement process under *either* scenario put forward by the government would provide a basis for a bid protest. The court found jurisdiction and reviewed a protestor's claim under 28 U.S.C. § 1491(b) in *TLT Constr. Corp. v. United States,* 50 Fed.Cl. 212 (2001), where the plaintiff was determined to be "technically unacceptable" despite being the low bidder. *Id.* at 214. The plaintiff was found by the procuring authority to have failed minimum technical factors, and its bid was eliminated from consideration before being compared to those of other offerors. *Id.* Nonetheless, the court in *TLT* concluded that the grounds for the disqualification could be reviewed by this court upon exercise of its bid-protest jurisdiction. *Id.* at 213. In that same vein, here, the government's counsel conceded that a "disqualified bidder [could] challenge in a bid protest the

action of the government agency." Hr'g Tr. 13:11–17 (Sept. 2, 2005). That in effect is what OTI is requesting.

In light of the broad language of Subsection 1491(b) and Congress's expressed intent that the Subsection encompass the entire procurement process, the court holds that it has subject matter jurisdiction to consider OTI's claim. 28 U.S.C. § 1491(b); *see* 41 U.S.C. § 403(2); *RAMCOR,* 185 F.3d at 1289. GAO's rationale in *Electro–Voice* is a persuasive guidepost indicating that a set of identically phrased contracts can be used by a procuring agency as a means of winnowing candidates for a procurement to determine which candidate or candidates will receive or share the ultimate award. That the competition consists of a framework built around stages of issued contracts rather than upon offers, does not dictate a different result. The concluding portion of Paragraph (1) of Subsection 1491(b) is sufficiently broad that the form in which the competition takes place does not matter.

The government's motion to dismiss for lack of subject matter jurisdiction is thus denied. The court's conclusion that it has jurisdiction to consider OTI's claim does not relieve OTI of its burden of showing that the actions of GPO were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 28 U.S.C. § 1491(b)(4) (incorporating the standard of review set out in 5 U.S.C. § 706); *see PGBA,* 389 F.3d at 1224–27.

### B. Discovery

OTI seeks leave to conduct expedited limited discovery on the ground that the administrative record in this case is "incomplete and inadequate." Pl.'s Disc. Mot. at 2. OTI specifically wants to take the depositions of four government officials that were in different respects involved in the procurement process for the Electronic Passport program. *Id.* at 4. Through such depositions, OTI hopes to discover additional evidence as to why GPO did not exercise its option for OTI and how it evaluated the sample electronic passport covers delivered by other contractors. *Id.* The government counters that OTI's motion is premature on the ground that the adminis-

trative record has yet to be filed, and thus any incompleteness within the record necessarily is speculative at this stage. Defendant's Response to Plaintiff's Motion for Leave of Court to Conduct Expedited Limited Discovery ("Def.'s Resp.") at 3–5.

■ A court reviewing an administrative record should focus on the "contemporaneous" record made at the time the action was taken. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). *See also Arch Chemicals, Inc. v. United States*, 64 Fed.Cl. 380, 386 (2005) (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *J.C.N. Constr. Co. v. United States*, 60 Fed. Cl. 400, 405 (2004), *aff'd*, 122 Fed.Appx. 514 (Fed.Cir.2005). However, as the Federal Circuit has noted, "the Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved." *Impresa Construzioni*, 238 F.3d at 1337 (citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), and *Camp v. Pitts*, 411 U.S. at 142 n. 3, 93 S.Ct. 1241). And, "[d]ecisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing ... [n]or are they formal rulemakings." *Impresa Construzioni*, 238 F.3d at 1337. Thus, gaps in the agency's rationale for taking an action in a procurement may well exist.

■ When a further explanation of a contracting officer's decision is "required for meaningful judicial review," a reviewing court has the power, and in some cases may have the obligation, to require such an explanation. *Impresa Construzioni*, 238 F.3d at 1338 (citing *Pension Benefit Guaranty Corp.*, 496 U.S. at 654, 110 S.Ct. 2668; *Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. 1241;

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The agency's decision is entitled to a presumption of regularity, which may be "rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." *Id.* As a matter of general administrative law, a possible means of addressing an inadequate record is to remand the agency action under review to the agency. *Id.* (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). However, in bid protest cases, providing for a deposition of the contracting officer may prove to be far more efficient. *Id.* at 1339. Such depositions may enable the court to satisfy its statutory duty to "give 'due regard' to 'the need for expeditious resolution of the action.' " *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (2005) (quoting 28 U.S.C. § 1491(b)(3)). In addition, when there is a reasonable possibility that a contracting officer may have taken into account information beyond that in the administrative record, supplementation of the record is appropriate. *See J.C.N. Constr.*, 60 Fed.Cl. at 404–05 n. 8 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)).[14]

■ Here, the notification by GPO's Contracting Officer in May 2005, informing OTI that its second prototype had failed the testing regime and that GPO would not be making any further orders to OTI for electronic passport covers, apparently serves as the agency's contemporaneous explanation for its decision. Compl. ¶¶ 26, 31. Because the administrative record has not been filed and is not available to the court, it is difficult now to determine whether any additional explanation is necessary. The court thus denies OTI's motion for leave to conduct discovery without prejudice to renewal of the motion once the administrative record has been filed.[15]

---

14. In examining an expanded record, the reviewing court should be mindful to examine critically any *post hoc* rationalizations for the agency action. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 547, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co–Steel Raritan, Inc. v.*

*International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed.Cir.2004).

15. Notwithstanding the government's opposition to any discovery aimed at supplementing the administrative record of the procurement, GPO itself seems to have supplemented the record by submitting the declarations of four government

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is DENIED, and OTI's motion for leave of the court to conduct expedited limited discovery is DENIED without prejudice. In addition, the government's motion to strike plaintiff's reply in support of its motion for limited discovery is DENIED; and a motion by the government for clarification is DENIED as moot.

On or before September 28, 2005, the parties shall review this opinion and order and submit proposed redactions of "confidential or proprietary information" within the meaning of RCFC App. C, ¶ 4.

On or before September 29, 2005, the government shall file the administrative record. *See* RCFC App. C, ¶¶ 8(e), 21–24. On or before September 30, 2005, the parties shall file a Joint Status Report that addresses a briefing schedule for motions for judgment on the merits. *See* RCFC App. C, ¶ 8(g).

IT IS SO ORDERED.

officials, the same four that OTI is now seeking to depose, to GAO as part of its proceeding on OTI's bid protest. *See* Plaintiff's Reply in Support of its Motion for Leave of Court to Conduct Expedited Limited Discovery ("Pl.'s Reply") at 8. These declarations were executed in late June 2005, after GPO had eliminated OTI as a competitor. *Id.* at Ex. E. Nonetheless, they presumably will be part of the "administrative record" before this court because the court by rule automatically incorporates into the administrative record of a protested procurement action "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the government." RCFC App. C, ¶ 22(u). In light of this circumstance, it may or may not become prudent and appropriate to grant leave to OTI to test these declarations by way of depositions of the declarants. That is a matter that should be remitted to future proceedings in this case, however.